ALLINGTON & CURTIS MANUFACTURING CO. *v.* DETROIT
REDUCTION CO.

1. SALE—CONSTRUCTION OF CONTRACT—"MANUFACTURED STATE."
   Under a contract for the sale of dust collectors for ore pulver-
   izers, providing that the apparatus should be shipped in
   "manufactured state," a failure to rivet the joints of the
   pipes before shipping was not a breach, where it appeared
   that the seller followed its usual practice in that respect.

2. TRIAL—CROSS-EXAMINATION—STATEMENTS OF COUNSEL.
   On the cross examination of a witness called by defendant as
   an expert on the manufacture and shipping of sheet iron, the
   witness testified that he had had experience ·in a certain
   manufacturing institution; and, on objection to a question as
   to what had become of that institution, counsel stated in the
   presence of the jury that, to test witness' expert knowledge,
   he proposed to show that the company was wrecked by his
   mismanagement, that two other companies were similarly
   wrecked, and that every other institution with which he had
   ever been connected had been ruined. The objection to the
   question was sustained. *Held*, that such statement was not
   sufficient cause for reversing a judgment for plaintiff.

3. SALE—BREACH OF WARRANTY—INSTRUCTIONS.
   In an action for the purchase price of dust collectors for ore
   pulverizers, warranted both to convey and separate ore, an
   instruction that, if the machine failed to do both, there was a
   breach of the warranty, was not objectionable as requiring a
   failure both to convey and separate in order to constitute a
   breach.

4. SAME.
   In an action for the purchase price of a machine, an instruction
   basing the right to recover on whether the machine could,
   under proper management, have been made to do the work
   contemplated, sufficiently covered defendant's claim that the
   machine was "impractical, and mechanically impossible" of
   successful operation.

5. SAME.
   In an action for the price of a machine, in which the buyer
   claimed a breach of a warranty that the machine would do
   certain work, an instruction whereby the case was made to

turn on whether or not the machine had done the work,
regardless of whether it would under proper management,
was properly refused.

6. SAME.

In an action for the price of dust collectors for ore pulverizers,
in which it appeared that the seller had warranted the col-
lectors to take the ore out of the pulverizers, an instruction
that there was a breach of the warranty if plaintiff's agent
had certain knowledge at the time the contract was made,
and contemplated the delivery of the ore by the pulverizers to
the collectors, was properly refused.

7. TRIAL—EVIDENCE—HARMLESS ERROR.

The admission of testimony in support of a claim which the
court afterwards ruled against in the charge was harmless.

8. SAME—INSTRUCTIONS.

The submission to the jury of an undisputed item of charge is
not prejudicial, where the verdict shows that they allowed it.

9. CORPORATIONS — DIRECTORS — EVIDENCE — ADMISSIONS — RES
GESTÆ.

In an action for the price of a machine sold to a corporation,
in which defendant claimed a breach of warranty as to the
work the machine was capable of doing, admissions by a
director of defendant corporation as to the manner in which
the machine was operating, not made in connection with the
performance of any duty devolving upon him, were not binding
on the corporation, though it appeared that he was present,
giving directions, at the installation of the machinery, and
was authorized to make some arrangement as to settlement
therefor.

10. SALE—BREACH OF CONTRACT—DAMAGES.

Defendant in an action for the price of a machine, having set
up the claim that plaintiff's agent, after repeated attempts to
make the machine do the work guaranteed, "gave it up as a
bad job," and went away, could not complain that he was
not permitted to recoup the cost of subsequent efforts made
by himself in the same direction.

Error to Wayne; Hosmer, J. Submitted January 15,
1903. (Docket No. 45.) Decided June 23, 1903.

*Assumpsit* by the Allington & Curtis Manufacturing
Company against the Detroit Reduction Company for

goods sold and delivered. From a judgment for plaintiff, defendant brings error. Reversed.

*John W. Beaumont* and *Bayard T. Brown*, for appellant.

*Humphrey & Grant*, for appellee.

HOOKER, C. J. The plaintiff contracted with the defendant to manufacture and deliver certain machinery for collecting the product from its ore pulverizers in use at Cripple Creek, or, to state it more accurately in the language of the contract:

" The contractor is to furnish all of the sheet-metal material and iron hangers for pipes, dust collectors, centrifugal traps, grading chambers, valves, and fans, *in manufactured state*, for two complete dust-collecting systems, to be connected to your two pulverizers. The systems to be of the return type, which is practically dustless, and to be substantially like pencil sketch submitted for approval. All of the material, except the fans, is sold f. o. b. cars Saginaw, Mich., and the fans, which are to be No. 10 Sturtevant Monogram pattern, are furnished f. o. b. cars Boston. All of the sheet-steel work is to be of No. 16 gauge galvanized steel, except the first joints in the delivery from the pulverizers, which is to be 12 gauge. The contractors are to furnish a mechanic to superintend and help install the plant, and all other labor is to be furnished by the purchaser:

"The contractor is to design the working drawings for constructing and installing the system, and guarantees that each plant will convey all of the material pulverized to a fineness of 100 mesh and finer, and catch the greater bulk of the same in the centrifugal trap interposed between the pulverizer and the fan, thus saving wear and tear on the fan. The contractor further guarantees that the greater portion of the remainder of the material which passes through the fan will be caught in the dust collector, from which the air is finally returned to the pulverizer. A small portion of the volume of air will be allowed to escape from the dust collector to a small supplemental collector, to compensate for a small amount of fresh air continually taken into the pulverizer.

"Each pipe leading from the delivery of the pulverizers is to be supplied with an enlarged grading chamber, which is to be adjustable so as to prevent particles coarser than 100 mesh from passing through and into the pipe system.

"The purchaser is to prepare return openings 12″ in diameter or an equivalent. On each side of each pulverizer the return pipes for the air are to be attached to these openings. The purchaser is to drive the fans to the required speed for handling the material, and pay the contractor eighteen hundred dollars for the fans and material furnished f. o. b. cars Boston and Saginaw, and pay the railroad fare, board, and $4.00 per day for mechanic's time. The contractor is to furnish material for soldering, riveting, etc., and the purchaser is to furnish scaffolding and permanent supports for heavy parts. Payments are to be made to the contractor as follows: One-third on delivery of material, one-third when system is installed, and one-third thirty days after installation. Shipment to be made within two weeks."

At the time this contract was negotiated, blue prints of defendant's pulverizers were furnished to the plaintiff. The apparatus was duly received at Cripple Creek, and set up under the supervision of plaintiff's expert. According to the defendant's claim, repeated experiments, both by the expert while there and by defendant after his departure, failed to make the apparatus do the work as guaranteed. Being sued for the contract price, the defendant set up the warranties, and sought to recoup damages for a failure to perform the contract. A verdict was rendered for the plaintiff, and defendant has appealed.

The defendant was in the possession of two ore pulverizers when it made its contract, as the contract shows. It sought to have the product of the pulverizers conveyed from them, and to that end the parties made the contract. The alleged warranties were: "(1) that each plant will convey all of the material pulverized to a fineness of 100 mesh and finer;" (2) that it will "catch the greater bulk of the same in the centrifugal trap interposed between the pulverizer and the fan, thus saving wear and tear on the fan;" (3) that "each pipe leading from the delivery of the

pulverizers is to be supplied with an enlarged grading chamber, which is to be adjustable *so as to prevent particles coarser than 100 mesh* from passing through and into the pipe system." It also provided that "the contractor is to furnish all of the sheet-metal material and iron hangers for pipes, dust collectors, centrifugal traps, grading chambers, valves, and fans, in manufactured state, for two complete dust-collecting systems, to be connected to your two pulverizers," as already stated.

The apparatus was shipped to, and arrived at, Independence, Colo. The defendant asserts that it was not shipped in a manufactured state, for the reason that the joints of pipe were not riveted together, and complains of the charge, in which the jury were told that the contract was complied with in that particular. The testimony of the plaintiff showed that it followed the usual practice of its factory in this respect, and, this being uncontradicted, we think the judge committed no error in his charge. He might have said to the jury that the contract contemplated the "manufactured condition" adopted by the plaintiff in its business. There was no testimony showing that such pipes were shipped by other factories in any other condition, if it would have been pertinent.

One of defendant's witnesses testified that he had experience as a manufacturer of sheet iron, and it was the uniform custom to ship smokestacks in car lengths, joints being riveted. On cross-examination, counsel drew from him that he had experience in the manufacture of sheet iron in a Michigan institution. He was asked what had become of the institution, and, upon objection being made, counsel stated to the court, in the presence of the jury:

"In connection with this, I offer to show by the cross-examination of this witness, who is testifying as an expert on this business, as he has testified, that he was the purchasing and the selling agent of that company. I propose to show that that company was wrecked by his management, and became insolvent; that the Lansing Lumber Company and the Capitol Lumber Company were wrecked by

him; and that every institution with which he has become connected since he was in business has been wrecked and ruined,—for the purpose of testing his expert knowledge in any or all business."

The court sustained the objection. We think this statement not a sufficient cause for reversing the judgment.

Defendant's counsel claim that the court erred in his charge upon the subject of the warranties. It is truly said that a failure to install machinery which should both convey and separate the grades of ore would be a breach of the warranty, and, if the instruction was that a failure to both convey and separate was essential to a breach, it was error. In our opinion, however, the charge is not open to such a construction, for it clearly states that a failure to do both was a breach of the warranty. It is clear that a failure to do one is a failure to do both, in the sense meant, and doubtless understood.

It is also said that the court erred, inasmuch as he failed to present the defendant's theory and allow the jury to pass upon it. This theory appears to have been that it was mechanically impossible that the machine should do the work contracted. It is claimed that the evidence showed this; i. e., there was evidence that it never did it. And it is claimed that it was shown that it was not so constructed as to be capable to do so, that it was an experiment, and that it was not designed to take ore out of the pulverizers, but only to convey it after being delivered by them. On the other hand, there was testimony tending to show that it did this work satisfactorily to the defendant, and that it was admitted, and accepted by its officers as a compliance with the contract. In this connection, defendant's counsel say that while the court evidently intended to sustain their contention, viz., that the contract required the machine to take the ore out of the pulverizers, he failed to clearly state that in his charge. An examination of the charge has led us to a different conclusion. He said:

"I cannot give the interpretation to the contract which the counsel for plaintiff seeks to have me give, and I

therefore charge you, with reference to this system, the phrase which is embodied in the contract, ' the contractor guarantees that each plant will convey all of the material pulverized to the fineness of 100 mesh and finer,' means, gentlemen of the jury, that that material should be taken from the pulverizer itself and removed to the bins. I think, gentlemen of the jury, that that is the natural import of the language, when the contract is construed as a whole."

The jury must have found that the machine actually did, or was capable of doing, what was contracted, according to the construction claimed for the contract by defendant, or that it was so accepted by the defendant. The broad question of the ability of the machine to do the work required was left to the jury. That included the question of whether it was a mechanical impossibility or not. He told the jury that the machine had not performed the work guaranteed, and said if the machine could not, under any operation, have been made to do the work, it was not a compliance with the contract. This covered the question as well as though the jury had been directed in other language to inquire whether the principles upon which it was planned were wrong, and the machine necessarily ineffective. The question was whether the machine did, or could be made to do, the work. The jury evidently found that it could have been made to do it under proper management.

The twenty-eighth request offered by defendant's counsel should not have been given, because the case was thereby made to depend upon whether the machine *had* done the work required, regardless of the question of management. The twenty-ninth was objectionable because it asked the court to decide that there was a breach of warranty if plaintiff's agent had certain knowledge at the time the contract was made, and contemplated delivery of the ore to the conveyor by the pulverizer. We are unable to say that the evidence was conclusive that plaintiff's dust system was "impractical, and mechanically impossible" of successful operation.

Testimony was offered by the plaintiff to show that the first joint of the conveyor was not an "operative part." This was apparently under plaintiff's claim that the contract did not require it to take the dust out of the pulverizer. We attach little significance to the question, but inasmuch as the court afterwards held, and charged the jury, against plaintiff's claim, no injury was suffered by the defendant from the testimony.

The same may be said about the evidence of what this conveyor could do when attached to the Ball pulverizers. Defendant says that with these machines the product was discharged through a funnel. The court told the jury that something more was required, when he ruled upon the question of construction. The testimony was of some value under the plaintiff's theory, although it may have become immaterial later. It may have been admissible when offered. It certainly was not injurious.

The next question relates to the testimony of Allington as to the effect of beating free gold. It was called out in answer to the testimony of Barnes. We think the court committed no error in admitting the proof. It was harmless, at all events.

A point is made that the plaintiff was permitted to contradict the written contract. The contract provided for some supplemental collectors, which were not sent, but were made afterwards. Defendant's counsel claim that the jury were not permitted to allow the defendant compensation for them. It is admitted that the court left this to the jury as a disputed fact, while counsel for plaintiff had conceded it to be a proper charge. We think that the proceedings show pretty conclusively that the item was allowed, and therefore that the judgment should not be reversed upon this ground, if the assignment of error is sufficiently specific, which plaintiff's counsel deny.

Error is assigned upon the admissions of Rowley, a director, who is said to have stated, while *en route* from Colorado to Chicago with plaintiff's representative, that he had received a telegram from his people at Cripple Creek stat-

ing that "they had made a thorough run that day, and had made good success with it; a good, successful run that day; everything satisfactory," —and to have made a similar statement to him after arriving at Chicago. There was further evidence as to the relation of Mr. Rowley to the work at Cripple Creek, and plaintiff's counsel claim that this shows that he was, with Barnes, in charge, and exercising authority consistent with the power to speak for the company. This testimony was undisputed, and was received under objection, and upon the undertaking to show that Mr. Rowley was really in charge of the work, and this was not done. These admissions were not a part of the *res gestœ.* They did not occur in connection with the performance of any act relating to defendant's business, within the scope of Rowley's authority. He was a director. As such, he had no power to accept this work, or to bind the company by an agreement in relation to it. The testimony that he was at Cripple Creek, giving directions, and that Barnes told Fralick that Rowley was going to Chicago, and would fix the matter up with Allington, even if Rowley was authorized to do that, would not make the admissions of Rowley to Fralick binding upon the company. While a corporation may be bound by the acts of one who is held out as having authority to act for it in its business, it does not thereby subject itself to liability for admissions made by such person, disconnected with the business of the principal. See Mechem, Agency, §§ 714, 715. In a note, the author says:

" 'The acts of an agent,' said Mr. Justice Harlan in a recent case, ' within the scope of the authority delegated to him, are deemed the acts of the principal. Whatever he does in the lawful exercise of that authority is imputable to the principal, and may be proven without calling the agent as a witness. So, in consequence of the relation between him and the principal, his statement or declaration is, under some circumstances, regarded as of the nature of original evidence, " being," says Phillipps, " the ultimate fact to be proved, and not an admission of some other fact." 1 Phil. Ev. 381. "But it must be remembered," says Greenleaf, " that the admission of the agent

cannot always be assimilated to the admission of the principal. The party's own admission, whenever made, may be given in evidence against him; but the admission or declaration of his agent binds him only when it is made during the continuance of the agency, in regard to a transaction then depending, *et dum fervet opus.* It is because it is a verbal act, and part of the *res gestæ,* that it is admissible at all, and therefore it is not necessary to call the agent himself to prove it; but, wherever what he did is admissible in evidence, there it is competent to prove what he said about the act *while he was doing it.*" 1 Greenl. Ev. § 113.

" 'This court had occasion, in *Packet Co.* v. *Clough,* 20 Wall. 540, to consider this question. Referring to the rule as stated by Mr. Justice Story in his treatise on Agency, § 134, that "where the acts of the agent will bind the principal, there his representations, declarations, and admissions respecting the subject-matter will also bind him, *if made at the same time, and constituting a part of the res gestæ,*" the court, speaking by Mr. Justice Strong, said:

" ' "A close attention to this rule, which is of universal acceptance, will solve almost every difficulty. But an act done by an agent cannot be varied, qualified, or explained, either by his declarations which amount to no more than a mere narrative of a past occurrence, or by an isolated conversation held, or an isolated act done, at a later period. The reason is that the agent to do the act is not authorized to narrate what he had done, or how he had done it, and his declaration is no part of the *res gestæ.*" '

" *Vicksburg, etc., R. R.* v. *O'Brien,* 119 U. S. 99 (7 Sup. Ct. 172).

" That the statements, representations, and admissions of the agent, made while acting within the scope of his authority, and in reference to the business which he is employed to transact, may be received in evidence against the principal, see " the many cases cited.

The defendant sought to show that it made further efforts to make the machine work after Fralick, plaintiff's agent, left, with a view to recouping the cost thereof. The court excluded the testimony upon the ground that inasmuch as the defendant claimed that he left, having "given the machine up as a bad job," the defendant should not make unnecessary expense, and, if it did so,

could not recoup for it. We are of the opinion that, upon this record, the judgment should not be reversed for this reason.

We are constrained to reverse the judgment. A new trial is ordered.

MOORE, CARPENTER, and GRANT, JJ., concurred. MONTGOMERY, J., did not sit.